UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: | CASE NO. 05-10137 |
| TORCH OFFSHORE, INC. | SECTION "B" |
| DEBTOR | CHAPTER 11 |
| *Jointly Administered with* | |
| TORCH OFFSHORE, LLC | CASE NO. 05-10138 |
| TORCH EXPRESS, LLC | CASE NO. 05-10140 |

BRIDGE ASSOCIATES, LLC
    Plaintiff

VERSUS                                                  ADV.P. NO. 07-1001

C & D MARINE, LLC and
HERCULES WIRE ROPE & SLING COMPANY, INC.
    Defendant

## MEMORANDUM OPINION

These matters came before the court on the complaint of Bridge Associates, LLC ("Bridge"), the liquidating trustee for the debtor companies, against C & D Marine, LLC ("C&D") and Hercules Wire Rope & Sling Company, Inc. ("Hercules"), to recover payments made by the debtors to C&D and Hercules in the ninety day preference period pursuant to the United States Bankruptcy Code, 11 U.S.C. § 547(b).[1]  C&D asserts an ordinary course of business defense under § 547(c)(2) of the Bankruptcy Code.  Hercules asserts an ordinary course

---

[1] The C&D trial took place on February 11, 2008; the Hercules trial took place on March 6, 2008.  Both C&D and Hercules were represented by the same attorney, and the same expert witnesses were used at the two trials.  The same question of law was presented to the court in both cases, and so the court will issue one opinion for both cases, although the court will separately analyze the specific fact issues relevant to each defendant.

1

of business defense under § 547(c)(2) of the Bankruptcy Code for two of the payments. Hercules claims that the third payment, which was made on the same date the Chapter 11 petition was filed, does not fall within the preference period. For the reasons set forth below, the court finds that the payments to C&D were in the ordinary course of business and dismisses Bridge's complaint as to C&D. The court further finds that the payments to Hercules were not made in the ordinary course of business as defined in § 547(c)(2) and thus are avoidable by Bridge.

**I.      Background Facts**

    **A.      C&D**

The parties stipulated most of the underlying facts. In the ninety days prior to the filing of the Chapter 11 petition on January 7, 2005, the debtors made ten payments to C&D totaling $161,552.56. The parties agree that each of the payments was made to C&D as a creditor to the debtors, the payments were made on account of antecedent debt owed by the debtors to C&D before the transfer was made, and the payments were made while the debtors were insolvent. Additionally, the parties agree that the payments fall within the ninety day period before January 7, 2005 and that the payments enabled C&D to receive more than it would have received if the debtors' cases were filed under Chapter 7 of the Bankruptcy Code, if the transfers had not been made, and under the provisions of Chapter 11 or the debtors' confirmed plan of reorganization. Thus, it is agreed that absent a valid defense by C&D the payments are preference payments avoidable by the trustee under the statutory language of § 547(b) of the Bankruptcy Code. The only issue presented to this court is whether the ordinary course of business defense set forth in § 547(c)(2) applies in this case.

### B. Hercules

Again, the parties stipulated most of the underlying facts. On or within the ninety days prior to the filing of the Chapter 11 petition on January 7, 2005, the debtors made three payments to Hercules totaling $35,696.91. The parties agree that each of the payments was made to Hercules as a creditor to the debtors, the payments were made on account of antecedent debt owed by the debtors to Hercules before the transfer was made, and the payments were made while the debtors were insolvent. Additionally, the parties agree that the payments enabled C&D to receive more than it would have received if the debtors' cases were filed under Chapter 7 of the Bankruptcy Code, if the transfers had not been made, and under the provisions of Chapter 11 or the debtors' confirmed plan of reorganization. The parties also agree that the first two payments were made within the ninety day preference period before January 7, 2005. They disagree as to whether the third payment, which was made on January 7, 2005 approximately two hours before the debtors filed the Chapter 11 petition, meets the criteria set forth in section 547(b)(4)(A). Thus, it is agreed that absent a valid defense by Hercules the first two payments are preference payments avoidable by the trustee under the statutory language of § 547(b) of the Bankruptcy Code. The two issues presented to this court are 1) whether the payment made on January 7, 2005 is avoidable under § 547(b)(4)(A), and 2) whether the ordinary course of business defense set forth in § 547(c)(2) applies in this case.

## II. Legal Analysis

### A. The disposition of the payment made on January 7, 2005.

Hercules argues that the payment received on January 7, 2005 is not subject to an avoidance action by Bridge because it was not made on or within ninety days before the date of

the petition filing. Section 547(b)(4)(A) reads in pertinent part, "the trustee may avoid any transfer of an interest of the debtor in property made on or within 90 days before the date of the filing of the petition." Hercules's argument seems to be a bit of a stretch. The language of the statute clearly says that the trustee may avoid a transfer made either on the date of the filing *or* within 90 days before the date of the filing. As long as a statute is clear and consistent, there generally is no need for a court to inquire beyond the plain language of the statute.[2] January 7, 2005 was the date of the filing and the payment was made on the date of the filing.

In support of it position that a payment made on the date of the filing is not avoidable, Hercules cites several cases holding that when counting back the ninety day period for the purpose of determining whether a payment was made "within 90 days before the date of the filing," the day before the date of the filing should be used as a starting point.[3] The court recognizes that this is how the majority of the cases have ruled on the question of how counting should be done for purposes of determining whether a payment allegedly made within 90 days before the date of the filing falls within that 90 day period, i.e., the courts are looking at how far back they should allow a trustee to go to avoid a payment.[4] None of those cases, however, holds that a payment made on the date of the filing is not avoidable. The court finds that the statute clearly states that a payment made on the date of the filing is avoidable for purposes of satisfying

---

[2] *U.S. v. Ron Pair Enterprises, Inc.,* 489 U.S. 235,109 S.Ct. 1026, 103 L.Ed.2d 290 (1989).

[3] *In re Terry Manufacturing Co.,* 325 B.R. 638 (Bankr.M.D.Ala. 2005); *In re Levinson,* 128 B.R. 365 (Bankr.S.D.N.Y. 1991)*; In re Baker & Getty Financial Services, Inc.,* 98 B.R. 300, 307 (Bankr.N.D.Ohio 1989).

[4] *See e.g. In re Levinson, LSA,* 128 B.R. 365 (Bankr.S.D.N.Y. 1991)(and cases cited therein).

§ 547(b)(4)(A), and the payment made to Hercules on January 7, 2005 is avoidable if it is not subject to a valid defense.[5]

### B. The ordinary course of business defense.

Section 547(c)(2) of the Bankruptcy Code states:

The trustee may not avoid under this section a transfer–
(2) to the extent that such transfer was–
    (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
    (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
    (C) made according to ordinary business terms.[6]

In *Matter of Gulf City Seafoods, Inc.,* 296 F.3d 363 (5th Cir. 2002), the United States Fifth Circuit Court of Appeals said that where the creditor raises an ordinary course of business defense, the creditor had the burden to show:

That as between it and the debtor, the debt was both incurred and paid in the ordinary course of their business dealings *and* that the transfer of the debtor's funds to the creditor was made in an arrangement that conforms with ordinary business terms - a determination that turns the focus away from the parties to the

---

[5] Although the court does not need to rule on the question of whether Bankruptcy Rule 9006 applies for purposes of counting the 90 day period in § 547, the reasoning in *In re Greene,* 223 F.3d 1064 (9th Cir. 2000) is persuasive to the court. In addition to there being no need to count out weekends and holidays when looking back at transfer periods because "a transfer can take place on any day of the week, including a weekend or holiday, and therefore does not require the bankruptcy court to be open for business," the court notes that now filing is done electronically, and also does not require the bankruptcy court to be open for business in most cases.

[6] The amendments to the Bankruptcy Code set forth in the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") change the requirements so that the creditor claiming the ordinary course of business defense need only prove that the payments are made in the usual course of business between that creditor and the debtor, *or* that they are made in accordance with industry standards, but because this case was filed prior to the BAPCPA amendments taking effect, the court looks at the Code and relevant caselaw pre-amendment.

practices followed in the industry.[7]

The parties have stipulated that the first element of the three part test is met as to all the payments in question, so the court only focuses on the second two elements.

### 1. Subjective prong of the test for ordinary course of business transactions.

In general, courts refer to the second element of the ordinary course defense, section 547(c)(2)(B) as the "subjective" element of the defense. The second element requires the court to examine the history of the transactions between the debtor and the creditor to determine whether the payments made during the preference period comport with the nature of the payments made before the preference period. The factors most commonly relied upon by courts in making this determination are: 1) the length of time the parties were engaged in the transactions at issue; 2) whether the amount or form of tender differed from past practices; 3) whether the debtor or creditor engaged in any unusual collection or payment activities; and 4) the circumstances under which payment was made.[8]

### a. Debtor's transactions with C&D.

Analyzing the transactions between the debtor and C&D, the court finds that the payments were made in the ordinary course of the business relationship between the two parties. First, both the testimony of C&D's owner and the record of the transactions between the parties indicate that the debtor began doing business with C&D in December 2003, just over a year before the debtor filed its Chapter 11 petition.[9] Thus, this was not a new relationship, and so the

---

[7] *Gulf City Seafoods,* 296 F.3d at 367.

[8] 5 Collier on Bankruptcy (15th ed. Rev.) at ¶ 547.04[2][a].

[9] C&D trial transcript at p. 12; C&D Trial Exhibit 1.

court will examine the payments Bridge is seeking to avoid in the context of the other payments made by the debtor. Second, the evidence shows that all of the payments were made by check, so there are no irregularities as to the method of payment.[10] Third, the owner of C&D testified that he undertook no collection activities. He also testified that the debtor normally made payments in the 90 to 120 day range, and that throughout its history with the debtor, C&D allowed late payment routinely.[11] Further the record of the transactions between the parties showed that the range of payment times before the preference period was between 65 and 168 days, with an average payment time of 92.4 days, while the range during the preference period was between 36 and 129 days with an average payment time of 89.7 days.[12] The court finds that on average there was no significant difference in the time period for payment by the debtor when the preference period is compared to the pre-preference period. Although there may be a couple of outliers in terms of the range of the time period for payment, these aberrations occur in both the preference period and the pre-preference period, and the court does not find them to be payments that fall outside the normal course of business between the parties.[13] Finally, the

---

[10] C&D Trial Exhibit 1.

[11] C&D trial transcript at p. 16.

[12] C&D Trial Exhibit 1; the court takes its figures from the column showing the time period between the date of the invoice and the date the check was written. If the court examined the difference between the date of the invoice and the date the check was cashed, there would not be a significant difference. Both expert witnesses also provided calculations, but there was a question as to whether Mr. Johnston had calculated the number of days correctly, so the court made its own calculations.

[13] For example, during the preference period, there were two payments that were issued 36 and 44 days from the date of invoice although the shortest amount of time between an invoice and check issuance in the pre-preference period was 65 days. Similarly, in the preference period, the longest amount of time between an invoice and the issuance of a check was 129 days, while in the pre-preference period, there were checks issued 142 and 168 days after the date of the

payments made both during and before the preference period vary in amount with no discernable pattern that would indicate a difference during the preference period. Overall, the court finds that the evidence shows that between the parties, there were no unusual payments during the preference period when those payments are compared with the transactions between the parties that occurred before the preference period.

      **b.**     **Debtor's transactions with Hercules.**

Analyzing the transactions between the debtor and Hercules, the court finds that the payments made on October 12, 2004 and December 28, 2004 were made in the ordinary course of the business relationship between the two parties. The court further finds that the payment made on January 7, 2005 was not made in the ordinary course of business between the two parties. First, the record of the transactions between the parties shows that the debtor began doing business with Hercules in December 2002, just over two years before the debtor filed its Chapter 11 petition.[14] Thus, this was not a new relationship, and so the court will examine the payments Bridge is seeking to avoid in the context of the other payments made by the debtor. Second, the evidence shows that the first two payments were made by check, which is consistent with the method of payment historically used by the debtor when paying Hercules. The third payment, however, was made by wire transfer, which was the first time the debtor had ever made a payment by wire transfer to Hercules.[15] The evidence also shows that the range of payments made by the debtor to Hercules before the preference period was between 45 and 135 days, with

---

invoice.

    [14] Hercules Trial Exhibit 1.

    [15] *Id.*

an average payment time of 104 days, the first payment made during the preference period was for four separate invoices, with an average payment time for the four of 109 days. The second payment was made 152 days after the date of the invoice. The third payment was for 30 separate invoices with an average payment time of 85 days with a range of 36 to 174. Although in the pre-preference period the debtor would make a payment on three to four invoices at one time, the debtor did not ever make payment on more than four invoices at one time. Additionally, the amounts of the payments in the pre-preference period never exceeded $6,194.40 for a single payment, while the third payment during the preference period was for $30,107.34. The court finds that only the first payment made during the preference period on October 12, 2004 in the amount of $2,190.37 meets the subjective prong of the ordinary course of business test. The third payment is clearly an aberration in many respects, and the court finds that the second payment is too far outside the normal range of payments to be included as ordinary course as between the parties.

  **2.**  **The objective prong of the test for ordinary course of business transactions.**

The final element of the ordinary course of business test is often called the "objective" part of the test. The Fifth Circuit most recently discussed § 547(c)(2)(C) in *Matter of SGSM Acquisition Company, LLC,* 439 F.3d 233 (5th Cir. 2006) stating:

> [I]n examining industry practice under § 547(c)(2)(C), the relevant inquiry is "objective"; that is to say, we compare the credit arrangements between other similarly situated debtors and creditors in the industry. Some latitude exists under the objective prong, as the courts should not impose a single norm for credit transactions within an industry; the inquiry is whether a particular arrangement is so out of line with what others do that it cannot be said to have been made within the ordinary course. As to what constitutes the relevant industry, *Gulf City* held that the term ordinarily encompasses suppliers to whom the debtor might reasonably turn for similar supplies and firms with whom the debtor competes for

customers.[16]

Similarly, *Gulf CitySeafoods* holds:

> Defining the industry whose standard should be used for comparison is not always a simple task. In our view, for an industry standard to be useful as a rough benchmark, the creditor should provide evidence of credit arrangements of other debtors and creditors in a similar market, preferably both geographic and product.[17]

At trial, C&D and Hercules introduced the expert testimony of John W. Theriot ("Theriot") a licensed CPA with 25 years of experience. Theriot testified that in preparing his expert report, he examined the practices of privately held companies in the oil and gas field service industry with respect to their accounts receivable using information from a database compiled by Pratt's Stats Transaction Reports, a national database that publishes information relating to business valuations.[18] Theriot found that of the 21 companies in the database, the average payment time for accounts receivable was 82.1 days.[19] Theriot further looked at the two Louisiana companies in the database and found that they had averages of 86.4 days and 93.9 days.[20] Theriot further testified that this was also consistent with his clients in the same industry although he declined to give specific information about his clients citing his obligation as a CPA to maintain the confidentiality of their information.[21]

---

[16] *SGSM*, 439 F.3d at 239.

[17] *Gulf City Seafoods,* 296 F.3d at 369.

[18] C&D trial transcript at p. 49.

[19] C&D trial transcript at p.51.

[20] C&D trial transcript at p. 52.

[21] C&D trial transcript at p. 52

Bridge countered Theriot's testimony and expert report with its own expert, Richard Johnston ("Johnston"), who has been an executive and a board member of several companies associated with the oil and gas industry for several years, and is now employed in a consultant position. Johnston testified that he believed the average accounts receivable time in the industry to be significantly shorter than the 80 to 90 day range suggested by Theriot's testimony. The court finds, however, that Johnston's testimony and report carried less weight than Theriot's testimony and report. As a CPA who works with accounts receivable, Theriot had more experience analyzing accounts receivable and payable data than Johnston who worked as an executive. Additionally, Johnston testified that many of the numbers he relied on he had not actually analyzed himself, but had instead relied on analysis conducted by his son and others, while Theriot analyzed the numbers in his report himself. Also, Theriot relied on a wide range of data of comparable companies when making his comparison, while Johnston only relied on his knowledge of the practices of companies he had personally worked for or with, which limited the pool of data he referenced in compiling his expert report.[22] Finally, at its trial, C&D presented additional evidence of industry standards, through the testimony of its owner, who

---

[22] The court is cognizant that in its opinion in *Richard Johnston, Trustee v. A&E Office Machines, Inc., et al.,* No. 00-1226 (Bankr.E.D.La. July 1, 2003), the court accepted Mr. Johnston as an expert witness and accepted his testimony that in 1997-1998 the delay in payment of invoices in a similar case was 45-50 days and since 2001 it was closer to 55-60 days. The court notes, however, that the testimony in that case referred to the boat and ship building industry, the time period was several years earlier than in this case, and that the expert witness testimony presented by the other side in that case was not as impressive as that offered by Mr. Theriot in this case. The court further takes note that the expert witness whose testimony the court rejected in that case was also named Theriot, but he was not the same person who testified on behalf of C&D and Hercules in this case.

stated that C&D had several other customers who paid on the same terms as the debtor.[23]

The court finds that the remaining payment made to Hercules does not fit within the industry standard. The payment was made on average 109 days after the date of the invoice, which is well outside the industry average found by Theriot. The court finds that C&D carried its burden with respect to the third element of the ordinary course of business defense, because the average of the payments it received during the preference period fall closely enough in line with the industry norms that the court does not find them to be outside the ordinary course of business.

### III.    Conclusion

Because C&D was able to prove all three elements of the ordinary course of business defense as set forth in § 547(c)(2) of the Bankruptcy Code, the court finds that the payments to C&D are not transfers that Bridge, as the liquidating trustee, may avoid. Bridge's complaint as to C&D is therefore dismissed. Hercules, however, was not able to prove the three elements with respect to any of the payments it received. The court therefore finds that Bridge is entitled to recover all three payments made to Hercules.

New Orleans, Louisiana, June 18, 2008.

                                                 *J. A. Brown*
                                                 Jerry A. Brown
                                                 U.S. Bankruptcy Judge

---

[23] C&D trial transcript at pp. 14 & 26.