# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: | BANKRUPTCY NO. 05-10137 |
| TORCH OFFSHORE, INC. | |
| DEBTORS | SECTION "B" CHAPTER 11 |

*Jointly Administered With*

| | |
|---|---|
| TORCH OFFSHORE, LLC | 05-10138 |
| TORCH EXPRESS, LLC | 05-10140 |

| | |
|---|---|
| THE TORCH LIQUIDATION TRUST BY AND THROUGH BRIDGE ASSOCIATES, LLC | ADV. NO. 07-01001 |

PLAINTIFF

VERSUS

A&B BOLT AND SUPPLY, INC., ET AL.

DEFENDANT

## MEMORANDUM OPINION

Pursuant to section 547(b) of the Bankruptcy Code, 11 U.S.C. § 547(b), Bridge Associates, LLC as Plan Administrator and Trustee for the Torch Liquidating Trust ("Plan Administrator"), brings before the court a complaint against Airdyne Lafayette, Inc. ("Airdyne") to recover payments made by the debtors to Airdyne in the ninety day preference period prior to the filing of this Chapter 11.[1]  Airdyne

---

[1] Trial was held on October 28, 2008. Airdyne's attorney used three witnesses: Lloyd Burkenstock, purchasing manager for the debtor from 1998-2004; Wayne Hebert,

asserts a contemporaneous exchange defense under § 547(c)(4) and an ordinary course of business defense under § 547(c)(2). For the reasons set forth below, the court finds that the payments to Airdyne during the ninety day preference period do not fall under the contemporaneous exchange or ordinary course of business defenses and are therefore avoidable preferences.

I. **Background Facts**

The parties stipulated to all facts necessary to determine that all of the transfers made by the debtors to Airdyne on or within ninety (90) days of the filing of the debtors' bankruptcy petitions on January 7, 2005 ("petition date") are subject to avoidance pursuant to 11 U.S.C. § 547(b).[2] In the ninety days prior to the petition date, the debtors made eight transfers to Airdyne totaling $33,756.00. The parties stipulated that each of the transfers:

1. was made to Airdyne as a creditor of the debtors;

2. was made on account of antecedent debt owed by the debtors to Airdyne before the transfer was made;

3. was made while the debtors were insolvent;

4. were made on or within ninety days before the filing of the debtors' bankruptcy petition on January 7, 2005;

---

manager of Airdyne Lafayette Inc.'s Broussard office; and John Greer, Airdyne's controller.

[2] Pursuant to the Court's Order dated October 10, 2007 (p-1337), the amendments to the Bankruptcy Code pursuant to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 108-09, 199 Stat. 23 (April 20, 2005) are inapplicable in this matter. All future references to 11 U.S.C. § 547 or any other section of the Bankruptcy Code are to the Bankruptcy Code as it existed on January 7, 2005, the date of filing of this case.

2

5. enabled Airdyne to receive more than it would have received if the debtors' cases were filed under Chapter 7, if the transfers had not been made, and under the provisions of Chapter 11 or the debtors' confirmed plan of reorganization.

Additionally, the parties stipulated to the payment history between the Debtors and Airdyne including (i) the number, amount, and date of each invoice issued to the debtors by Airdyne; (ii) the number, amount, and date of issuance of each of the checks issued in payment by the debtors; and (iii) the number of days delay between the invoice date and the date the check paying such invoice was issued.

Thus, it is agreed that absent a valid defense by Airdyne the payments are preference payments avoidable by the trustee under the statutory language of § 547(b) of the Bankruptcy Code.

## II. **Legal Analysis**

### a. Ordinary Course of Business Defense under 11 U.S.C. 547(c)(2)

Section 547(c)(2) of the Bankruptcy Code states:

> The trustee may not avoid under this section a transfer–
> (2) to the extent that such transfer was–
> (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
> (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
> (C) made according to ordinary business terms.

In *Matter of Gulf City Seafoods, Inc.,* 296 F.3d 363 (5th Cir. 2002), the United States Fifth Circuit Court of Appeals held that where the creditor raises an ordinary course of business defense, the creditor had the burden to show:

3

> That as between it and the debtor, the debt was both incurred and paid in the ordinary course of their business dealings *and* that the transfer of the debtor's funds to the creditor was made in an arrangement that conforms with ordinary business terms - a determination that turns the focus away from the parties to the practices followed in the industry.[3]

The parties have stipulated that the first prong of the three part test is met as to all the payments in question, so the court focuses only on the second and third prongs.

### i. Subjective prong of the test for ordinary course of business transactions.

In general, courts refer to the second prong of the ordinary course of business defense, section 547(c)(2)(B), requiring that the debtor show the transfers were "made in the ordinary course of business or financial affairs of the debtor and the transferee," as the "subjective" prong of the defense. This prong requires the court to examine the history of the transactions between the debtor and the creditor to determine whether the payments made during the preference period comport with the nature of the payments made before the preference period. The factors most commonly relied upon by courts in making this determination are: 1) the length of time the parties were engaged in the transactions at issue; 2) whether the amount or form of tender differed from past practices; 3) whether the debtor or creditor engaged in any unusual collection or payment activities; and 4) the circumstances under which payment was made.[4]

---

[3] *Gulf City Seafoods,* 296 F.3d at 367.
[4] 5 Collier on Bankruptcy (15th ed. Rev.) at ¶ 547.04[2][a].

Analyzing the transactions between the debtor and Airdyne, the court finds that the payments were not made in the ordinary course of the business relationship between the two parties. The record of the transactions between the parties shows that the debtor began doing business with Airdyne in November 2002, over two years before the debtor filed its Chapter 11 petition.[5] Thus, this was not a new relationship, and so the court will examine the payments the Plan Administrator is seeking to avoid in the context of the other payments made by the debtor.

First, Airdyne's controller testified that the debtor normally made payments in the 90 to 120 day range, and that throughout its history with the debtor, Airdyne allowed late payment routinely. Nonetheless, the record of the transactions between the parties showed that the range of payment times before the preference period was between 44 and 126 days, with an average payment time of 80.6 days; while the range during the preference period was between 126 and 236 days with an average payment time of 172.25 days.[6] The court finds that on average there was a significant difference in the time period for payment by the debtor when the preference period is compared to the pre-preference period and that none of the payments made during the preference period were made within the normal average pre-preference period payment time of 80.6 days. Second, the evidence shows that all of the payments were made by check, so there are no irregularities as to the

---

[5] Airdyne Trial Exhibit 2.
[6] *Id*.

5

method of payment.[7] Third, the manager for Airdyne's Broussard office and the controller for Airdyne testified that Airdyne undertook no collection activities. Finally, looking at the last factor, there is no evidence of any special circumstances under which the payments were made.

The court finds that the evidence shows that between the parties, the payments made during the preference period were not made in the ordinary course of business between the parties when those payments are compared with the transactions between the parties that occurred before the preference period. Although it is only one factor, the extreme difference in the time period for payment by the debtor, from an average of 80.6 days prior to the preference period and an average of 172.25 during the preference period, shows a significant enough difference in payment activity to outweigh the other factors.[8]

### ii. The objective prong of the test for ordinary business transactions

The third and final prong of the ordinary course of business test is often called the "objective" part of the test. The Fifth Circuit recently discussed § 547(c)(2)(C) in *Matter of SGSM Acquisition Company, LLC,* 439 F.3d 233 (5th Cir. 2006) stating:

> [I]n examining industry practice under § 547(c)(2)(C), the relevant inquiry is "objective"; that is to say, we compare the credit arrangements between other similarly situated debtors and creditors in the industry. Some latitude exists under the objective prong, as the courts should not impose a single norm for credit transactions within an industry; the inquiry is whether a particular arrangement is so out of

---

[7] *Id.*

[8] *Matter of SGSM Acquisition Company, LLC,* 439 F.3d 233, 240 (5th Cir. 2006).

> line with what others do that it cannot be said to have been made within the ordinary course. As to what constitutes the relevant industry, *Gulf City* held that the term ordinarily encompasses suppliers to whom the debtor might reasonably turn for similar supplies and firms with whom the debtor competes for customers.[9]

Similarly, *Gulf City Seafoods*, relied upon in *Matter of SGSM,* holds:

> Defining the industry whose standard should be used for comparison is not always a simple task. In our view, for an industry standard to be useful as a rough benchmark, *the creditor should provide evidence of credit arrangements of other debtors and creditors in a similar market, preferably both geographic and product.*[10]

None of the three witnesses discussed substantively the arrangements of other debtors and creditors in the oil and gas supply industry. Airdyne's controller, John Greer, testified that Airdyne has other customers, about 4%, that take more than 120 days to make payments. He also testified that approximately 96% of all Airdyne's outstanding receivables for any given month are paid in less than 90 days.[11] The debtor's former purchasing manager, Lloyd Burkenstock, testified that "late payments" are the norm in the industry and that the debtors generally paid invoices within 90-120 days.

Although this information gives the court an indication of Airdyne's arrangements with its other customers and the debtors' arrangements with Airdyne, this information does not satisfy the final prong of § 547(c)(2) of the Bankruptcy Code. In fact, the testimony given would lead the court to believe that

---

[9] *SGSM*, 439 F.3d at 239.
[10] *Matter of Gulf City Seafoods,* 296 F.3d 363, 369 (5th Cir. 2002).
[11] Trial testimony of John Greer, controller for Airdyne.

normal industry practice is that payments are made within 90 days or less of receipt of an invoice.

Because Airdyne failed to provide adequate information about the payment practices of similarly situated debtors and creditors in the industry, it has failed to meet its burden of proof for this prong of the analysis. Thus, Airdyne has failed to establish the existence of an ordinary course of business defense under 11 U.S.C. § 547(c)(2).

**b. Contemporaneous Exchange Defense under 11 U.S.C. § 547(c)(4)**

Section 547(c)(4) of the Bankruptcy Code states:

> The trustee may not avoid under this section a transfer-
> (4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—
> (A) not secured by an otherwise unavoidable security interest; and
> (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor;

Airdyne has failed to offer any actual support for its alleged defense under 11 U.S.C. § 547(c)(4). Airdyne argued that its continuing to allow the use of its equipment constitutes new value. However, there are no invoices in evidence and the stipulated payment history contains no reference to any invoices for any goods or services provided subsequent to any of the relevant transfers. Airdyne's decision to refrain from seizing its equipment offers no support for the existence of a new value defense. Airdyne did not introduce any evidence or testimony regarding any agreement to forbear from seizing equipment or any evidence or testimony that the debtors ever accepted and continued to make payments based

upon any such agreement. Regardless, if there were evidence of a forbearance agreement, the law does not support the general proposition that forbearance amounts to new value.[12] Thus, Airdyne did not meet its burden of proof under Section 547(c)(4).

### III. Conclusion

Because Airdyne was unable to prove the existence of a valid defense under § 547(c) of the Bankruptcy Code, the court finds that the payments to Airdyne during the preference period were avoidable transfers and that the Plan Administrator is entitled to recover the eight payments made by the Debtors. Judgment is hereby entered in favor of the Plan Administrator against Airdyne in the total amount of $33,756 plus interest at the federal judicial rate running from the date of this Judgment.

New Orleans, Louisiana, February 19, 2009.

*J. A. Brown*
Jerry A. Brown
U.S. Bankruptcy Judge

---

[12] *See Jones v. Soc'y Bank & Trust (In re Riggs),* 129 B.R. 494, 496-97 (Bankr. S.D. Ohio 1991); *Wolinsky v. Central Vt. Teachers Credit Union (In re Ford)* 98 B.R. 669, 683-84 (Bankr. D. Vt. 1989) (stating "[F]orbearance, whether consensual/non-consensual, direct/indirect, unilateral/bilateral, or intentional/unintentional, may not constitute new value under § 547(a)(2) for § 547(c)(4) purposes."); *Bavely v. Merchants Nat'l Bank (In re Lario)*, 36 B.R. 582, 584 (S.D. Ohio 1983) (finding lessor's forbearance from exercising his right to evict debtor did not constitute new value).